UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Stephen Goupil,
     Petitioner

     v.                           Civil No. 07-cv-58-SM
                                      Opinion No. 2008 DNH 046
Bruce Cattell, Warden,
New Hampshire State Prison for Men,
     Respondent

## **O R D E R**

In April of 2004, two men broke into a young woman's apartment, held her at knife-point, and sexually assaulted her repeatedly before stealing her car and fleeing the scene. Petitioner, Stephen Goupil, was subsequently arrested and, when his DNA was compared with DNA in sperm collected from the victim, it was determined to be a match.  He was convicted in state superior court of five counts of aggravated felonious sexual assault and one count of theft by unauthorized taking.

Goupil appealed his convictions to the New Hampshire Supreme Court asserting, among other things, that he was deprived of his constitutionally guaranteed right to a fair and impartial jury. State v. Goupil, 154 N.H. 208 (2006).  Specifically, Goupil claimed that his criminal trial was tainted because one of the jurors made derogatory comments about criminal defendants in his

personal Web log (known generally as a "blog").  The court rejected Goupil's arguments and affirmed his conviction.

Goupil now seeks federal habeas corpus relief, <u>see</u> 28 U.S.C. § 2254, asserting that the New Hampshire Supreme Court's resolution of his constitutional claims was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  <u>See</u> Petition for Writ of Habeas Corpus (document no. 1) at 2.  And, although not expressly stated in his petition, it appears Goupil also challenges the state trial court's factual determination that the author of the Web log was not biased and, therefore, that there was no reason to vacate Goupil's convictions on that ground.

Pending before the court is the State's motion for summary judgment on all claims advanced in Goupil's petition.  For the reasons set forth below, the State's motion is granted.

## Standard of Review

I.  <u>Summary Judgment</u>.

When ruling on a party's motion for summary judgment, the court must "view the entire record in the light most hospitable

2

to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990).  Summary judgment is appropriate when the record reveals "no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>Int'l Ass'n of Machinists and Aerospace Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).

II.  <u>Habeas Relief and 28 U.S.C. § 2254</u>.

Since passage of the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), the power to grant federal habeas relief to a state prisoner with respect to claims adjudicated on the merits in state court has been substantially limited.  A federal court may not disturb a state conviction unless the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  Alternatively, habeas relief may be granted if the state court's resolution of the

issues before it "resulted in a decision that was contrary to, or
involved an unreasonable application of, clearly established
Federal law, as determined by the Supreme Court of the United
States."  28 U.S.C. § 2254(d)(1).  See also Williams v. Taylor,
529 U.S. 362, 399 (2000).

With respect to claims brought pursuant to section
2254(d)(1), the United States Supreme Court has explained the
distinction between decisions that are "contrary to" clearly
established federal law, and those that involve an "unreasonable
application" of that law.

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by [the Supreme]
> Court on a question of law or if the state court
> decides a case differently than [the Supreme] Court has
> on a set of materially indistinguishable facts.  Under
> the "unreasonable application" clause, a federal habeas
> court may grant the writ if the state court identifies
> the correct governing legal principle from [the
> Supreme] Court's decisions but unreasonably applies
> that principle to the facts of the prisoner's case.

Williams, 529 U.S. at 412-13.  The Court also noted that an
"incorrect" application of federal law is not necessarily an
"unreasonable" one.

> The most important point is that an unreasonable
> application of federal law is different from an
> incorrect application of federal law . . . . Under §

4

> 2254(d)(1)'s 'unreasonable application' clause, then, a
> federal habeas court may not issue the writ simply
> because that court concludes in its independent
> judgment that the relevant state-court decision applied
> clearly established federal law erroneously or
> incorrectly.  Rather, that application must also be
> unreasonable.

Id. at 410-11 (emphasis in original).

Finally, it probably bears noting that a state court need not rely upon, nor need it even cite, Supreme Court precedent in order to avoid resolving a petitioner's claims in a way that is "contrary to" or involves an "unreasonable application of" clearly established federal law.  See Early v. Packer, 537 U.S. 3, 8 (2002) ("Avoiding these pitfalls does not require citation of our cases – indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.") (emphasis in original).

With those principles in mind, the court turns to Goupil's petition.

## Background

After the jury returned its verdict in Goupil's criminal trial, the court and counsel learned that the foreperson of the jury – Juror 2 – had written comments in his Web log referencing,

among other things, his up-coming jury duty.  The New Hampshire
Supreme Court described the material facts (which Goupil does not
challenge) as follows:

> Prior to jury selection, Juror 2 wrote, "Lucky me, I
> have Jury Duty! Like my life doesn't already have
> enough civic participation in it, now I get to listen
> to the local riff-raff try and convince me of their
> innocence."  He also made general comments regarding
> his impression of the jury selection process, his
> desire not to serve as a juror, and his disgust at
> possibly being chosen as a juror for an unrelated child
> pornography case.  Once he was seated on the
> defendant's jury, but prior to the start of the trial,
> Juror 2 wrote: "After sitting through 2 days of jury
> questioning, I was surprised to find that I was not
> booted due to any strong beliefs I had about police,
> God, etc."  Prior to trial, Juror 2 also posted: (1) a
> photograph depicting a woman's deformed face after she
> was hit by a drunk driver; and (2) a statement
> containing his views on a United States Supreme Court
> decision ruling against the death penalty for
> juveniles.  During the defendant's trial, Juror 2 made
> a blog entry that referenced an unrelated shooting
> incident in Atlanta.
>
> The trial court learned of Juror 2's blog soon after
> the jury returned the verdicts and was released from
> duty.  The court conducted a chambers conference at
> which it denied the defendant's first motion to set
> aside the verdicts, but ruled that further inquiry into
> Juror 2's blog and its impact, if any, on the remaining
> jurors was warranted.
>
> The following day, the trial court conducted individual
> voir dire with each of the jurors, including the
> alternates.  The court began with Juror 2, who
> acknowledged having a blog.  The court then asked the
> following questions:
>
> > Q: Okay.  And on that web log you posted, I guess
> > it was February 9th, something to the effect of
> > now you get to listen to the local riff raff

trying to convince me of their innocence.  And I
recognize that that was before you were
instructed.  Did you understand the instructions
that I gave both on a general basis when you first
came in and more specifically on this case that
the burden of proof is on the state to prove
guilt, rather than the defendant to prove
innocence?

A: I did, your Honor.

Q: Okay.  Did you follow those instructions in the
course of your deliberations?

A: I did, your Honor.

Q: Okay.  Did your feeling before those
instructions that it is the responsibility of
quote, local riff raff to convince you of [their]
innocence, did your feeling there in any way
interfere with your ability to follow the
instructions with respect to the actual burden
being on the state?

A: It did not, your Honor.

Q: Okay.  Your postings also indicated two other
areas that I just want to ask you about.  One is
you mentioned in your web log certain news
articles that you've been following.

First, I want to ask, during the course of this
trial from the time-I know you didn't come up to
the bench, but at any time did you read – up until
the verdict did you read, listen or watch any
press coverage of the State v. Goupil case?

A: I did not, your Honor.

Q: Okay.  Your web log mentioned certain coverage
with respect to the shootings in Atlanta and
certain security concerns raised by that.  Did
that in any way interfere with your ability to
deliberate this case based on the evidence?

A: Absolutely not, your Honor.

Q: Okay.  Your web log also indicated certain
reaction to the Supreme Court's opinion with
respect to the death penalty for juveniles.  Did
that in any way have any impact on your
deliberations in this case?

A: Absolutely not, your Honor.

Q: Did you raise any of these issues in terms of
the context of this case with any of your
colleagues on the jury?

A: Absolutely not, your Honor.

The trial court then consulted with counsel, and
defense counsel requested that the court ask Juror 2
additional <u>voir</u> <u>dire</u> questions; the court agreed.  When
directly asked what his general knowledge was prior to
jury selection with respect to the burden of proof in a
criminal case, Juror 2 denied having any predisposition
or thoughts on who had the burden of proof.  The trial
court then asked, "So what was the genesis of the riff
raff?  Convince me of the innocence remark [*sic*]."
Juror 2 answered, "Your Honor, I don't even recall
making that remark and it was probably an off-hand
remark.  There was no real thought behind it."  In
response to further questions, Juror 2 stated that he
understood the proper burden of proof when he
deliberated as a juror on the defendant's case.  He
also: (1) denied being exposed to any press coverage
regarding this case prior to being drawn as a juror;
(2) stated that no one responded to his postings on the
web log that related to his jury service on this or any
other case; (3) denied receiving any responses to his
blog; (4) denied being contacted by anyone trying to
influence his decision as a juror; (5) stated that
nothing interfered with his ability to follow the jury
instructions with respect to the law of the case; and
(6) stated that he was absolutely able to make a fair
and impartial verdict based upon his evaluation of the
evidence in the case as applied to the law given by the
trial court.

During its individual <u>voir</u> <u>dire</u> of the remaining
jurors, the trial court informed each juror that one of
the jurors had been making postings on a web log that

may have influenced the defendant's case.  The court
then asked: (1) whether there was any discussion by the
jurors about the case before deliberations began; (2)
whether each juror understood the burden of proof and
presumption of innocence; (3) whether there was any
discussion of the shootings in Atlanta as they might
possibly relate to this case; and (4) whether there was
any reference to the Supreme Court's decision regarding
the death penalty for juveniles.  All of the jurors
indicated that there had been no discussion of this
case prior to deliberation.  All of the jurors
indicated their understanding of the State's burden of
proof.  All jurors except Juror 13, an alternate,
stated that there had been no discussion regarding
either the Supreme Court's decision regarding the death
penalty for juveniles or the unrelated shootings in
Atlanta.  Juror 13, however, stated that he vaguely
remembered a general discussion regarding the unrelated
Atlanta shootings but could recall no specifics.

All jurors except Juror 4 indicated that they
understood the presumption of innocence.  Juror 4
initially stated that he believed that the jury did not
understand this principle because "[the jurors] were
wondering why [the defendant] didn't take the stand in
defense of himself."  Nevertheless, when further
questioned, Juror 4 stated that both he and the jury
understood the court's instruction that the defendant
had no obligation to take the stand.  Juror 4 also
indicated that he "understood that the obligation to
take the stand would be inconsistent with the state's
burden of proving guilt."  At defense counsel's
request, the trial court further questioned Juror 4 in
the following manner:

> Q: [Juror 4], in the course of the deliberations
> you said that there were some jurors who may have
> wondered why the defendant did not take the stand.
> In terms of the reaching of the verdicts, was
> there any question that the jury and all the
> jurors individually understood by the time the
> verdicts were rendered that the fact that the
> defendant [did not take] the witness stand should
> have no impact on their deliberations whatsoever?
>
> A: No.

9

Q: I just want to make sure I understand what your no means.  No what?  Let me ask it again, ... when the jury rendered its verdict ... did you understand any juror to think that they were ... making the finding of guilty because the defendant did not take the stand?

A: No.

Q: Okay. All the jurors understood at that point that the defendant had no obligation to take the stand?

A: Yes.

Q: All the jurors at that point understood that the burden of proof is entirely on the state?

A: Yes.

In response to defense counsel's request to broaden its inquiry further, the trial court specifically asked whether Juror 2 was one of the jurors who expressed confusion regarding why the defendant may not have taken the witness stand; Juror 4 answered, "No."

At the conclusion of the individual <u>voir</u> <u>dire</u>, the trial court found that Juror 2 was credible and that he and the remaining jurors understood the law regarding the presumption of innocence and the State's burden of proving guilt beyond a reasonable doubt.  The court was also satisfied that Juror 2 and the remaining jurors followed the court's instructions with respect to these principles, as well as other points of law contained in the instructions.  The trial court found that there was no indication that there had been any postings on the blog regarding either the defendant's case or anything that would question Juror 2's impartiality. Furthermore, the trial court granted defense counsel additional time to submit evidence of any postings to the blog; none was forthcoming.

<u>State v. Goupil</u>, 154 N.H. at 214-17.

After discussing the relevant judicial precedent and considering Goupil's arguments, the state supreme court held that the comments made in Juror 2's blog were not presumptively prejudicial and, therefore, Goupil bore the burden of demonstrating that those comments adversely affected his right to a fair and impartial jury. The court then concluded that Goupil failed to demonstrate that Juror 2's conduct caused him to suffer any actual prejudice or that his constitutional rights were violated.

> In order to be presumptively prejudicial, the communication had to be either: (1) between jurors and persons associated with the case about matters unrelated to the case; or (2) between jurors and others about the case. Here, the defendant did not allege that any other jurors even knew of Juror 2's blog. Nor does the statement, on its face, reference anything specifically related to the defendant's case. Thus, we cannot conclude that the statement was presumptively prejudicial. Consequently, the defendant had the burden to demonstrate actual prejudice. Absent evidence that other jurors were aware of the blog or any of the statements contained therein, we cannot conclude that the blog, on its face, actually prejudiced the defendant. Nor can we conclude, from the record, that Juror 2 failed to answer the trial court's pretrial <u>voir</u> <u>dire</u> questions honestly. Accordingly, the trial court's denial of the defendant's first motion to set aside the verdicts was not erroneous.

<u>Id</u>. at 219 (citations omitted).

In his petition seeking habeas corpus relief, Goupil asserts
that, "[w]hile serving as a member of the jury pool, [Juror 2's]
public, opinionated and thus, inappropriate, behavior was
prejudicial to Mr. Goupil's defense and rendered him unqualified
for jury duty."  Petition at 4.  He goes on to claim that "due to
[Juror 2's] refusal to admit his web publishings prior to trial,
[Goupil] was tried by a jury that was not impartial.  The trial
court erred when it did not set aside the verdict and the Supreme
Court erred when it upheld the trial court's decisions.  Thus,
Mr. Goupil's rights to a fair trial by an impartial jury, as
guaranteed by the Sixth, through the Fourteenth, Amendment to the
United States Constitution, were violated."  Petition at 9-10.
It seems, then, that Goupil is challenging the state court's
determination that Juror 2 was not biased and was, therefore,
qualified to sit as a member of the jury.

Goupil also asserts that Juror 2's blog was an impermissible
and prejudicial "extraneous" or "extrinsic" influence on the
jury.  He also appears to suggest that Juror 2 himself was an
improper extrinsic influence on the jury:

> In the case at hand, Mr. Goupil's <u>jury foreman was the
> extraneous influence</u>. . . . Not only was [Juror 2's]
> conduct defined as extraneous communications, he, as a
> jury member and chosen foreman, <u>was an extraneous
> influence</u>.  Once the trial court was aware of his

12

```
activities, [Juror 2's] conduct was per se inter-jury
publications during a felony trial.
```

Petition at para. 25 (emphasis supplied).


### Discussion

The Sixth Amendment to the Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury." Typically, when a criminal defendant alleges that one or more jurors was not impartial, the defendant bears the burden of demonstrating the juror's bias, as well as the prejudice such bias caused the defendant to suffer.  See, e.g., Smith v. Phillips, 455 U.S. 209, 215-17 (citing Remmer v. United States, 347 U.S. 227 (1954); Dennis v. United States, 339 U.S. 162 (1950); and Chandler v. Florida, 449 U.S. 560 (1981)).


There are, however, two exceptions to that general rule.  A presumption of prejudice arises if a juror communicates (about any topic) with "any person who is associated with the case, or who has an interest in the outcome of the case." United States v. O'Brien, 972 F.2d 12, 14 (1st Cir. 1992).  The same is true when a juror speaks with a third party about the case on which the juror is sitting.  Id.  As the Supreme Court has noted, the

"presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant."  <u>Remmer</u>, 347 U.S. at 229.


I.    <u>Juror 2's Blog and Prejudicial Juror Communications</u>.

     In resolving Goupil's constitutional claims, the state supreme court concluded that the comments made by Juror 2 in his blog did not fall into either of the two categories of presumptively prejudicial juror communications.  <u>State v. Goupil</u>, 154 N.H. at 219 (noting that "the defendant did not allege that any other jurors even knew of Juror 2's blog.  Nor does the statement [about the "local riff-raff"], on its face, reference anything specifically related to the defendant's case.").  Accordingly, the court held that Goupil bore the burden of demonstrating that he actually suffered some sort of prejudice as a result of the comments Juror 2 made in his blog.  <u>Id</u>.  And, after reviewing the record of the hearing conducted by the trial court, the state supreme court concluded that Goupil failed to carry that burden.


     Goupil challenges that decision, asserting that the state trial court erred when it concluded that the comments made by

Juror 2 in his blog were not presumptively prejudicial.  More
specifically, he asserts that the state court's decision on that
issue was contrary to, or involved an unreasonable application
of, Supreme Court precedent on this issue.  The court disagrees.

Goupil's entire argument turns on his assertion that Juror
2's blog constituted inherently prejudicial "extrinsic
communications" with a third party about the case on which Juror
2 was sitting.  According to Goupil:

> any public communication by a sitting juror regarding
> the trial at hand is potentially improper <u>extrinsic
> communication</u>.  This is all the more so in the present
> case because the <u>extrinsic communication</u> came from the
> jury foreman, included the highly prejudicial term
> "riff raff" in connection with the current case,
> misstated the burden of proof, and offered an extremely
> negative perspective on the judicial process in general
> in a public forum.  Furthermore, the source of the
> <u>extraneous communication</u>, [Juror 2] himself, was in the
> jury room in a role that was at least somewhat
> supervisory.

Petitioner's memorandum (document no. 7) at 3 (emphasis
supplied).  It would seem, however, that Goupil is confusing
comments made by a juror that might suggest an inherent bias,
with "extrinsic communications" made by a juror to a third party
about the case on which the juror is currently sitting.  That is
to say, Goupil is attempting to characterize Juror 2's comments
as something they plainly are not.

15

A Web log or blog is akin to a personal journal or diary, albeit one that the author publishes to the Web and permits others to read.  If Juror 2 had simply written his comments in a diary and not shared those writings with anyone, Goupil surely would not claim that the diary constitutes an "extraneous communication" with third parties of the sort that gives rise to a presumption of prejudice.  The mere fact that Juror 2 chose to makes his journal available to members of the public does not change the situation because, as the trial court specifically found, not only did none of his fellow jurors read his online blog, but none was even aware of its existence.  See State v. Goupil, 154 N.H. at 219 ("defendant did not allege that any other jurors even knew of Juror 2's blog.").  Goupil does not challenge that factual finding.

In support of his position, Goupil relies upon the Supreme Court's opinion in Parker v. Gladden, 385 U.S. 363 (1966).  See Petitioner's memorandum at 2-3 (Goupil also makes passing reference in his memorandum to Brecht v. Abrahamson, 507 U.S. 619 (1993) and, in his petition, to Patterson v. Colorado, 205 U.S. 454 (1907)).  But, none of that Supreme Court precedent stands for the proposition that pre-trial personal opinions of the sort expressed by Juror 2, even if made in a manner accessible to

16

members of the public, are, as a matter of law, presumptively prejudicial to a criminal defendant.

In Parker, the Court addressed a situation in which a court bailiff made comments to at least one juror and one alternate juror indicating that he believed the defendant was a "wicked fellow" and "guilty" of the crimes with which he had been charged. Parker, 385 U.S. at 363-64. Under those circumstances, the Court concluded that the bailiff's comments were inherently prejudicial and violated the defendant's constitutionally protected right to have all "evidence developed against [him] come from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, cross-examination, and of counsel." Id. at 364 (citation and internal punctuation omitted). Goupil asserts that "implicit in the holding is [the proposition] that if even one juror was tainted or influenced by extraneous communications, the verdict should be overturned." Petitioner's memorandum (document no. 7) at 3. Even assuming Goupil has accurately understood the implications of the holding in Parker, because none of the other jurors sitting on his criminal case was even aware of Juror 2's blog, plainly none of those jurors was influenced by external

statements of the sort the <u>Parker</u> Court concluded were inherently prejudicial.

In short, there is nothing in the record to suggest that Juror 2's blog constituted an impermissible communication with a third party <u>about</u> <u>Goupil's</u> <u>trial</u>.  Rather, the content of that blog – the majority of which was written <u>prior</u> to the start of Goupil's trial – does not relate specifically to Goupil's case (the comments posted to the blog during Goupil's trial addressed wholly unrelated matters: a courtroom shooting in Atlanta and the author's selection for jury service on an entirely different case).  Instead, the questioned comments in Juror 2's blog amount to little more than a generalized commentary on the criminal process and criminal defendants.  And, as noted by the state courts, there is no evidence to suggest that any of the other jurors sitting on Goupil's case were aware of Juror 2's blog.

In light of the foregoing, Juror 2's blog cannot be said to have constituted an "extrinsic" communication with, or influence upon, those members of the jury.  It follows, then, that Goupil was not entitled to the <u>Remmer</u> presumption of prejudice.  As the court of appeals for this circuit has observed:

> Thus, [Supreme Court precedent] requires a fair hearing
> for nonfrivolous claims of extraneous influence or the
> like, but does not strictly mandate the use of a
> rebuttable presumption in every case.  Rather, the
> presumption is applicable only where there is an
> egregious tampering or third party communication which
> directly injects itself into the jury process.  Put
> another way, the <u>Remmer</u> standard should be limited to
> cases of significant <u>ex</u> <u>parte</u> contacts with sitting
> jurors or those involving aggravated circumstances far
> beyond what has been shown here.

<u>United States v. Boylan</u>, 898 F.2d 230, 261 (1st Cir. 1990).  <u>See</u>
<u>also</u> <u>United States v. Bradshaw</u>, 281 F.3d 278 (1st Cir. 2002);
<u>United States v. Gomes</u>, 177 F.3d 76 (1st Cir. 1999).


Here, the state trial court conducted a comprehensive post-

verdict voir dire of the jurors and afforded Goupil a fair

hearing on his claim that Juror 2's blog represented an

impermissible extraneous influence on the jury.  Goupil has not

shown that he was entitled to anything more.  More importantly,

he has failed to demonstrate that the state court's resolution of

the issues he presented was "contrary to, or involved an

unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."  28 U.S.C.

§ 2254(d)(2).

II.   <u>Juror 2's Personal Biases</u>.

Although Juror 2's pre-trial comments suggest that he might have come to the process with a bias against criminal defendants in general and/or a misunderstanding about the State's burden of proof in criminal cases, still, there is nothing in the record to suggest that he was unable to set aside those (possible) personal biases, listen carefully to the evidence presented at trial, and hold the State to its high burden of proof.  In short, nothing suggests that he failed in any of his duties as a juror.  In fact, the transcripts of the trial court's post-verdict voir dire of Juror 2 demonstrate just the opposite.

A trial court's determination that a juror is capable of setting aside any opinions about the accused and acting in an impartial manner is a question of fact, which, in the context of a habeas petition, is entitled to a presumption of correctness. <u>See, e.g.</u>, <u>Patton v. Yount</u>, 467 U.S. 1025, 1036-37 (1984).  <u>See also</u> <u>Sleeper v. Spencer</u>, 510 F.3d 32, 38 (1st Cir. 2007) ("In reviewing a habeas corpus petition under AEDPA, a federal court will presume that the state court's findings of fact are correct. For this purpose, the term 'facts' refers to basic, primary, or historical facts, such as witness credibility and recitals of external events.") (citations and internal punctuation omitted).

To be entitled to the habeas relief he seeks, Goupil must rebut

that presumption of correctness by clear and convincing evidence.

See 28 U.S.C. § 2254(e)(1).


In this case, after conducting an extensive investigation

into the matters raised by Goupil, the trial court made the

following factual findings with respect to Juror 2:

> I find that [Juror 2] understood the burden of proof
> [and] that he understood the need to follow the court's
> instructions, whatever misapprehension he may have been
> under before he reported for jury selection, with
> respect to the burden of proof[.]  [T]here is no
> indication that he lacked understanding as to the
> court's instructions as to what the proper burden of
> proof was, the presumption of innocence, and the need
> to follow the court's instructions with respect to that
> during the course of the trial and in the course of the
> deliberations.  And I don't have any reason to think
> that he did not fairly and impartially review the
> evidence.

Trial transcript (document no. 5), Day Seven, at 91.  Nothing

identified in either Goupil's petition or his legal memorandum is

even remotely sufficient to demonstrate, by clear and convincing

evidence, that those factual findings were "unreasonable" in

light of the evidence presented in the state court proceedings.

See 28 U.S.C. § 2254(d)(2).

## Conclusion

It is not unusual for citizens who are called to jury service to have certain preconceived notions or general social attitudes about crime and criminal defendants.  At least some must be credited with understanding that, normally, a neutral and detached magistrate has already concluded that probable cause existed to arrest the defendant and a grand jury has concluded that probable cause exists to charge the defendant with violating the law.  In other words, many potential jurors likely understand the criminal justice system and realize that other people have reviewed at least some of the evidence against the defendant and concluded that there is reason to think that he or she committed the crime(s) charged.

Plainly, however, such knowledge and pre-trial opinions do not automatically disqualify a person from serving on a criminal jury.  What is important is the ability of jurors to disregard those personal notions, listen attentively to the evidence produced during the trial, maintain an open mind throughout the course of the trial, carefully and faithfully follow the court's instructions on the governing law (including, of course, those on State's burden of proof), deliberate in good faith with the other members of the jury, and base their verdict exclusively on the

evidence admitted at trial, rather than any extrinsic evidence gathered, or personal communications made with non-jurors, during the course of the trial.  As the Supreme Court has observed:

> due process does not require a new trial every time a juror has been placed in a potentially compromising situation.  Were that the rule, few trials would be constitutionally acceptable.  The safeguards of juror impartiality, such as <u>voir</u> <u>dire</u> and protective instructions from the trial judge, are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.  Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.

<u>Phillips</u>, 455 U.S. at 217.


The fact that Juror 2 might have come to the criminal justice process with preconceived notions about the "local riff-raff" and even a mistaken understanding of which party bears the burden of proof in a criminal trial is, in this case, of little moment.  Nor is the fact that he posted those views in his blog. Upon learning of Juror 2's blog, the trial judge conducted an extensive inquiry into any possible effect it might have had on Goupil's trial.  And, based on the results of that inquiry, the court reasonably and sustainably concluded that: (1) Juror 2's comments did not relate to Goupil's trial; (2) Juror 2 understood

the presumption of innocence and the State's burden of proof and applied those concepts in reaching a verdict; (3) none of the other jurors was even aware of Juror 2's blog until after the jury returned its verdict and the court began its investigation; and (4) each juror, including Juror 2, clearly understood that the State bore the burden of proving defendant's guilt beyond a reasonable doubt and defendant had no obligation whatsoever to "prove" his innocence or to take the witness stand.

Given those facts, the trial court sustainably concluded that Juror 2's blog was not the type of "extraneous" or "extrinsic" trial communication by or with a juror that is presumptively prejudicial to a criminal defendant. Accordingly, the court held that Goupil bore the burden of demonstrating actual prejudice. And, when he failed to carry that burden, the court properly denied his motion to vacate his convictions. None of those decisions was contrary to, or involved an unreasonable application of, Supreme Court precedent. Nor were any of the underlying factual findings of the trial court unreasonable in light of the evidence presented to it. Consequently, Goupil is not entitled to habeas relief and the State's motion for summary judgment (document no. 6) is granted.

24

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

February 26, 2008

cc:  Mark L. Sisti, Esq.
     Ann M. Rice, Esq.
     Stephen Fuller, NHAG's Office
     John Vinson, NH DOC